## IN THE CIRCUIT COURT FOR BALTIMORE CITY

| | |
|---|---|
| UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION,<br>250 W. Pratt St., 24th Floor,<br>Baltimore, MD 21201,<br><br>          Plaintiff,<br><br>v.<br><br>MARYLAND CARE, INC. d/b/a<br>MARYLAND PHYSICIANS CARE<br>1201 Winterson Road, 4th Floor,<br>Linthicum, Maryland 21090<br><br>Serve on:<br>The Corporation Trust, Inc.<br>2405 York Road, Suite 201<br>Lutherville Timonium, MD 21093,<br><br>          Defendant. | \*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*<br>\*   Case No.:   C-24-CV-25-005690<br>\*<br>\*   **Jury Trial: Yes**<br>\*<br>\*<br>\*<br>\* |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT AND DEMAND FOR JURY TRIAL

The University of Maryland Medical System Corporation ("UMMS"), by and through its

undersigned attorneys, files this Complaint against Maryland Care, Inc. d/b/a Maryland Physicians

Care ("MPC") and, in support thereof, states as follows:

## INTRODUCTION

1.      MPC is a for-profit health plan that systematically and wrongfully denies the health

benefit claims of its members under a profit-oriented business model.

2.      UMMS is a private, non-profit, university-based, regional health care system

dedicated to serving the health care needs of Marylanders. UMMS has been compelled to file this

Complaint against MPC to recover over $15 million **owed for medical services provided to MPC's**

1

EXHIBIT
**1**

members, all of whom are **insured through Maryland Medicaid's mandatory managed care** program, HealthChoice.

3.      Each year, the State of Maryland allocates over $1 billion in federal and state tax dollars to MPC to provide for the medical needs of our most vulnerable residents. MPC is required by contract and statute to pay for the health care services for these patients, including at medical facilities and hospitals operated by UMMS. As shown below, MPC has abused **the State's trust** and violated its obligations by improperly denying millions of claims and pocketing the money to bolster its own profits.

4.      The UMMS network consists of academic, community, and specialty hospitals that collectively provide 25% of all hospital-based care in the State. In 2023 alone, UMMS had nearly 100,000 hospital admissions, over 1.3 million outpatient visits, and over 300,000 emergency visits. UMMS serves as a critical safety net for economically vulnerable and underserved populations, providing over $103 million in uncompensated care to Maryland residents through financial need and other charitable programs. When for-profit health plans like MPC boost their own profits by systematically failing to pay UMMS for services rendered to their members, that failure causes grave injury not only to UMMS and the members, but to the entire health ecosystem in the State.

5.      UMMS provides health care services to patients covered under a variety of health care benefit plans, including patients whose health care coverage is provided through Maryland Medicaid. Medicaid is a joint federal and state program that provides free or low-cost health care coverage to the most vulnerable members of our community, including children, pregnant women, seniors, and people with disabilities. One in four Marylanders is covered through Maryland Medicaid programs, which are administered by the Maryland Medicaid Administration within the Maryland Department of Health ("MDH"). Approximately twenty-five percent of all patients

2

served by UMMS annually are insured through Medicaid **managed care organizations** ("Medicaid MCOs").

6.      The Maryland Medicaid programs include HealthChoice, a mandatory Medicaid managed care program that provides Maryland Medicaid participants with the ability to enroll in one of nine Medicaid MCOs. Each MCO is paid a per-member, per-month capitation fee by the MDH to cover, among other things, medical benefits to Marylanders who qualify for Medicaid benefits and administration costs. The monthly fees MDH pays to Medicaid MCOs vary by member based on age, demographic factors, and prior medical history, according to a schedule established by MDH. Medicaid MCOs also receive supplemental payments from MDH for certain high-cost services (such as newborn deliveries) provided to their members. Medicaid MCOs do not just process claims. As managed care organizations, they also have a contractual and statutory responsibility to manage **their members' health outcomes**. The fees paid to MCOs by the State compensate them for carrying out those managed care services, including member education, wellness initiatives, and care management and coordination.

7.      Each Medicaid MCO operates under a contract with MDH that outlines its responsibilities to its members and to MDH, specifies the benefits and services the MCO must cover, and details the terms, conditions, and requirements governing payment for covered services provided by health care professionals and facilities to its members.

8.      MPC is a for-profit Medicaid MCO that participates in HealthChoice. Under its **contract with MDH (the "Plan Contract"), MPC** receives more than $1 billion of taxpayer dollars each year to provide health care and managed care services to Maryland Medicaid enrollees who entrust their care to MPC by selecting it as their MCO **(each an "MPC Member")**. In exchange for these substantial government payments, MPC is contractually obligated to manage the care of its

3

members, which includes paying the health care professionals and facilities who provide them with covered health services. To entice Medicaid recipients to enroll with MPC, MPC publicly touts its commitment to fully covering Medicaid benefits, as stated on its website: "**MPC provides free, quality health care services to Maryland's HealthChoice enrollees** *by extending the full benefits of Medicaid*."

9.      The majority of the more than $1 billion the State pays annually to MPC is in the form of capitation fees paid prospectively each month per member enrolled with MPC. The more members MPC has, the more fees it collects. MPC must pay for the covered services and benefits received by MPC Members. But **MPC's profit** derives primarily from the difference between the capitation payments it receives and the amounts it disburses for member care. When MPC wrongfully denies claims and refuses to pay for covered services, it retains the unspent capitation funds, rather than returning them to the State. Each denial boosts **MPC's profit**s at the expense of Maryland Medicaid enrollees and the health care providers and facilities who serve them.

10.     As a Medicaid MCO, MPC is required by law and under the Plan Contract to maintain adequate networks of health care providers and facilities, including hospitals, to ensure the availability of covered services to MPC Members. Network adequacy standards—established by state law, regulation, and the terms of the Plan Contract—require MPC to ensure that its members have access to health care providers within defined maximum wait-times and maximum travel distances, based on the type of service needed. MPC fulfills the network adequacy requirements by contracting with health providers.

11.     To ensure an adequate and competitive network, MPC entered into a Participating Health Provider Agreement with UMMS, effective January 1, 2018 **(the "PHP Agreement")**, pursuant to which UMMS agreed to provide services to MPC Members. MPC agreed to pay for

4

those services at specified rates, many of which are set by the Maryland Health Services Cost Review Commission ("HSCRC"), which establishes hospital-specific and service-specific rates for all inpatient, hospital-based outpatient, and emergency services performed in acute general and specialty hospitals in the State. HSCRC rate-setting is designed to ensure equity and fairness among all purchasers of hospital services. Rates not mandated by the HSCRC are negotiated and agreed to by UMMS and MPC.

12.     Because UMMS is the largest hospital system in Maryland, with the broadest geographic reach and facilities that range from small regional medical centers to Shock Trauma, UMMS's participation in MPC's network is critical to MPC's ability to meet its network adequacy obligations under the Plan Contract and to attract and retain members, which also increases the fees it receives from Maryland Medicaid. Individuals choosing among Medicaid MCOs in Maryland are much less likely to choose a Medicaid MCO that does not include UMMS as an in-network provider.

13.     At all times relevant to this Complaint, UMMS has provided medical care, including emergency services, to MPC Members consistent with its obligations under the PHP Agreement.

14.     UMMS has been compelled to bring this lawsuit against MPC because, notwithstanding MPC's legal and contractual obligations to its members, to MDH, and to UMMS, MPC has engaged in longstanding, ongoing, deliberate, and systematic practices of denying timely and complete payment for covered medical services provided to MPC Members by UMMS. These practices are designed to force UMMS into MPC's onerous, time-consuming internal appeals processes that are managed and controlled by MPC itself.

15.     **MPC's** wrongful denials have caused UMMS to lose over $15 million—losses UMMS is forced to absorb, but should not have to. The millions of dollars that MPC has wrongfully withheld from UMMS are needed by UMMS, as a safety-net system, to provide desperately needed medical care and services across the State.

16.     The funds that MPC wrongfully withheld unjustly enrich MPC, causing economic harm not only to UMMS but also to the State and every individual seeking hospital care within Maryland. The funds MPC diverts from care compensation are public dollars entrusted to MPC by the State to ensure the medical needs of our most vulnerable neighbors are met, and such diversion harms both the State and its residents economically. When for-profit entities like MPC wrongfully deny payment, the unpaid claims become unreimbursed health care, which is factored into future hospital and care costs and drives up the cost of care for everyone.

## PARTIES

17.     Plaintiff University of Maryland Medical System Corporation is a domestic, not-for-profit corporation established under the laws of the State of Maryland. UMMS has a principal place of business located at 250 W. Pratt Street, Baltimore, Maryland 21201.

18.     Defendant Maryland Care, Inc., doing business as Maryland Physicians Care, is a foreign, for-profit corporation established under the laws of the State of Delaware. MPC is certified by the MDH as a managed care organization and listed as an "Active Company" by the Maryland Insurance Administration. MPC has a principal place of business located at 1201 Winterson Road, Linthicum, Maryland 21090.

6

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over MPC pursuant to Md. Code Ann., Cts. & Jud. Proc.

§ 6-102(a) as a person served with process in and maintaining its principal place of business in the

State of Maryland.

20.     The Court has proper subject matter jurisdiction pursuant to Md. Code Ann., Cts.

& Jud. Proc. § 1-501 and Md. Code Ann., Cts. & Jud. Proc. § 3-409.

21.     Venue is proper in this Court pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-

201(a).

## BACKGROUND

### *MPC-UMMS Participating Health Provider Agreement*

22.     At all times relevant to the allegations contained in this Complaint, MPC and

UMMS have been parties to the PHP Agreement.

23.     MPC entered into the PHP Agreement to ensure that MPC Members have access to

the comprehensive health care services, including the emergency and specialized care provided by

UMMS. The demographics of MPC Members and UMMS's mission as a safety-net hospital are

deeply connected, as UMMS prioritizes serving low-income individuals, working-poor families,

and other vulnerable populations—many of whom make up MPC membership and often face

limited access to essential health care. UMMS's willingness to enter into the PHP Agreement

enables MPC to fulfill its contractual duty to the State and to MPC Members to provide them with

access to the essential health care services they require and deserve.

24.     Although UMMS has consistently honored its obligations and provided high-

quality care to MPC Members, MPC has disregarded its obligation to pay UMMS for these critical

services.

25.    The PHP Agreement is not a one-way street. While it exists to ensure that MPC Members have access to the compassionate, world-class, state-of-the-art, sophisticated health care services that UMMS provides across the State, the PHP Agreement also exists to ensure that UMMS is paid appropriately for the services it renders to MPC members.

26.    The PHP Agreement states:

A. Compensation

1. MPC shall compensate [UMMS] in the manner as described in Attachment B for the provision of Covered Services to eligible Members delivered in accordance with the terms and conditions set forth in this Agreement within thirty (30) business days from the date of receipt of a Clean Claim in accordance with applicable State regulations. MPC shall not be responsible to pay for any otherwise Covered Services rendered to Members prior to the date the Member becomes enrolled by the Applicable State or Federal Agency with MPC (except with respect to certain newborns pursuant to the Applicable State or Federal Agency regulations) or after the Member loses eligibility or otherwise is disenrolled from MPC.

2. MPC shall comply with all Applicable Law, and Plan Contract(s) requirements that apply to payment of claims.

27.    "Covered Services" are defined in the PHP Agreement as "the medical services available to Members under the Plan Contract(s) that [UMMS] is agreeing to provide to Members under this Agreement and pursuant to MPC Policies in effect from time to time." A "Clean Claim" is a claim as to which all of the information necessary to process it has been provided.

28.    MPC is obligated under the PHP Agreement to pay UMMS at the rates set forth in the fee schedule incorporated into the PHP Agreement. If MPC fails to pay a Clean Claim within thirty (30) days, MPC is obligated to pay interest on the unpaid amounts at per annum rates beginning at 1.5% for the 31st to the 60th day, 2% from the 61st through the 120th day, and 2.5% after the 120th day.

8

29.     In the three years preceding the filing of this Complaint, MPC has wrongfully failed and refused to pay thousands of Clean Claims, totaling over $15 million in unpaid fees owed, plus significant accrued interest.

*MPC is Required to Cover Claims for Emergency Services*

**The Coverage Standard for Emergency Services**

30.     A large majority of the claims submitted by UMMS and wrongfully denied in whole or part by MPC are Clean Claims for emergency services. **MPC's approach to emergency service** claims is particularly egregious, demonstrating a willful, deliberate, and systematic pattern of denials that flagrantly disregard the coverage obligations and standards Medicaid MCOs are specifically required to uphold for emergency services.

31.     A Medicaid MCO's obligation to pay a hospital for emergency services is established by federal and state laws that are designed to be commensurate with the federal **Emergency Medical Treatment and Labor Act ("EMTALA"),** which requires all licensed hospitals with an emergency department **("ED")** to provide services to all patients who present with emergency medical conditions regardless of their ability to pay.

32.     In line with that mandate, health plans—and Medicaid MCOs in particular—must provide coverage for emergency services rendered at a hospital's **ED.** The federal Medicaid statute **requires that a managed care organization provide coverage for emergency services "without regard to prior authorization or the emergency care provider's contractual relationship with the organization or manager."** Maryland law similarly compels health plans to provide coverage for emergency services rendered at hospitals.

33.     **Whether a service must be covered as an** "emergency" **service** is determined by a **coverage standard known as the** "prudent layperson" **standard ("PLP Standard") adopted by**

9      -

Congress as part of the Balanced Budget Act of 1997 ("BBA"). Under the BBA, Congress mandated that Medicaid MCOs provide coverage not just for emergencies, but also for "medical services needed to evaluate or stabilize an emergency medical condition." Notably, the term "emergency medical condition" is defined from the perspective of the patient seeking care, not the treating physician or the Medicaid MCO. Under the PLP Standard, the test for coverage is whether a prudent layperson with average knowledge of health and medicine would reasonably believe their symptoms required immediate medical attention to avoid serious harm. Federal regulations and guidance reinforce this patient-centered standard, prohibiting insurers from denying coverage based on retrospective clinical outcomes if the patient's decision to seek care was reasonable under the circumstances. This ensures that patients are not penalized for seeking emergency care when symptoms appear urgent.

34.     In short, under the PLP Standard, a patient can seek services on an emergency basis from an emergency room if a prudent layperson would have thought the services rose to the level of an emergency, even if it later turns out that the patient did not need services on an emergency basis. And, if the PLP standard is met, a Medicaid MCO must pay the hospital that provided those services.

35.     In violation of its legal and contractual obligations, MPC blatantly and systematically disregards the PLP standard by, among other practices: automatically denying payment for services not expressly listed on its pre-determined "auto-pay" list; relying on its own retrospective clinical review—rather than the PLP standard—to make coverage decisions for emergency ancillary and diagnostic services; and routinely refusing to pay for behavioral health services provided in the ED. This conduct enhances MPC's profitability in keeping with its business model of denying claims to retain capitation funding.

## The Plan Contract

36.     The Plan Contract adopts and incorporates the EMTALA and PLP standards. It obligates MPC to cover all Medicaid benefits that are required to be covered under federal and/or Maryland law and regulations.

37.     With respect to federal law, MPC is obligated to, among other things, comply with requirements governing emergency and post-stabilization services under 42 CFR 438.114, which requires that Medicaid MCOs (including **MPC) cover and pay for medical treatment for** "acute **symptoms of sufficient severity (including severe pain) that a prudent layperson"** would expect to require immediate medical attention.

38.     Under 42 C.F.R. § 438.114(c)(1)(ii), a Medicaid MCO, such as MPC:

> "[m]ay **not deny payment for** treatment obtained under either of the following circumstances: (A) An enrollee had an emergency medical condition, including cases in which the absence of immediate medical attention would not have had the outcomes specified in paragraphs (1), (2), and (3) of the definition of emergency **medical condition in paragraph (a) of this section."**

39.     Further, a Medicaid MCO, **such as MPC, may not "[l]imit what constitutes an emergency medical condition [...] on the basis of lists of diagnoses or symptoms," and ultimately, "[t]he attending emergency physician, or the provider actually treating the enrollee, is responsible** for determining when the enrollee is sufficiently stabilized for transfer or discharge, and that determination is binding on the [Medicaid MCO] **as responsible for coverage and payment."**

40.     With respect to Maryland law, **"emergency medical condition" and "emergency services" are defined pursuant to Code of Maryland Regulations ("COMAR")** 10.07.08.01 and COMAR 10.67.04.20.

41.     MPC is required to under the Plan Contract pay a hospital emergency facility and provider, without requiring prior authorization or approval for payment from the Medicaid MCO to:

> (1) Health care services that meet the definition of emergency services in Health-General Article, §19-701, Annotated Code of Maryland;
>
> (2) Medical screening services rendered to meet the requirements of the federal Emergency Medical Treatment and Active Labor Act;
>
> (3) Medically necessary services if the Medicaid MCO authorized, referred, or otherwise instructed the enrollee to use the emergency facility and the medically necessary services are related to the emergency condition; and
>
> (4) Medically necessary services that relate to the condition presented and that are provided by the provider in the emergency facility to the enrollee if the Medicaid MCO fails to provide 24-hour access to a physician.

42.     In 2018, MDH issued a transmittal to Medicaid MCOs (like MPC) and acute care hospitals (like UMMS) "to clarify" MDH's policy regarding "coverage of emergency room care, post-stabilization care, and ancillary services provided during emergency room or post-stabilization care" and to confirm that the MDH policy "aligns with the federal requirements outlined in 42 CFR 438.114 and 42 CFR 422.113."

43.     The transmittal confirmed that COMAR requires Medicaid MCOs "to pay hospital emergency facilities and providers for medical screening services rendered to meet the requirements of the federal Emergency Medical Treatment and Active Labor Act." The transmittal also confirmed that Medicaid MCOs are

> prohibited from placing requirements that are administratively burdensome on a hospital facility or provider to receive payments for medically necessary diagnostic services to determine the presence or absence of an emergency condition.

Examples of administratively burdensome, prohibited requirements identified by MDH include:

(1) denying all billed ancillary services associated with screening in the original emergency room

12

and requiring providers to file appeals for payment of those services, and (2) denying EMTALA-related charges based on the provider's final diagnosis instead of using the prudent layperson criteria for emergency medical conditions based on the presenting symptoms.

44.    Referencing and incorporating both federal and state law, the Plan Contract unquestionably requires MPC to provide coverage for emergency services to its members, and to pay UMMS for such services.

45.    Notwithstanding these obligations, MPC consistently, deliberately, and systematically fails to provide such coverage and to pay UMMS for such services. And, in doing so, it engages in each of the administratively burdensome services that MDH has identified as prohibited practices.

### The PHP Agreement

46.    Beyond the general obligation to pay UMMS for services covered under the Plan Contract, the PHP Agreement specifically addresses emergency services.

47.    Under the PHP Agreement, UMMS is required to provide "**Emergency Medical Services**" to MPC Members, including services needed to immediately treat life-threatening emergencies. The PHP Agreement defines Emergency Medical Services as:

> health care items and *services furnished or required to screen and stabilize an Emergency Medical Condition*, which may include, but shall not be limited to, **health care services that are provided in a licensed hospital's emergency facility** by an appropriate provider.

48.    An Emergency Medical Condition is defined to include the PLP Standard:

> those health care services and/or goods provided or required to evaluate and treat a sudden and unexpected situation or occurrence or a sudden onset of a medical or behavioral condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that the failure of immediate medical attention could reasonably be expected by a *prudent layperson, who possessing an average knowledge of health and medicine*, to result in:

13

Death; or

Placing the health of the individual in serious jeopardy; or

Serious impairment to any bodily functions; or

Serious dysfunction of any bodily organ or part; or

Serious harm to a Member or others due to an alcohol or drug abuse emergency; or

Injury to Member or bodily harm to others or

With respect to a pregnant woman, who is having contractions: (1) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (2) that transfer may pose a threat to the health or safety of the Member or the unborn.

49.     Thus, MPC is required to cover all health care items and services furnished or required to screen and stabilize an Emergency Medical Condition, which is defined with respect to the PLP Standard.

50.     Independent from, but consistent with, the PHP Agreement, UMMS is obligated under EMTALA to provide a medical screening exam and ancillary services to determine whether or not an emergency medical condition exists for any individual who comes to an UMMS ED and **a request is made on that individual's behalf for examination or treatment for a medical condition.** If UMMS determines that the individual has an emergency medical condition, UMMS is obligated to provide further medical examination and such treatment as may be required to stabilize the medical condition or, in limited situations, transfer the individual to another medical facility. Thus, **whenever MPC Members present at UMMS's ED, they are promptly** screened and stabilized based on their presenting symptoms and circumstances. This practice ensures that each MPC Member— like all patients who come to an UMMS ED—receives the necessary level of stabilizing care.

51.     **An EMTALA medical screening examination can, according to CMS, "involve a** wide spectrum of actions, ranging from a simple process involving only a brief history and physical

14

examination to a complex process that involves performing ancillary studies and procedures." The treating physician uses his or her medical judgment to determine the nature of the screening for each presenting ED patient, including what testing or other ancillary services are needed until the patient is stabilized or appropriately transferred.

52.     An Emergency Medical Condition is not determined by a medical professional or left to the discretion or second-guessing of MPC. Rather, the PLP Standard requires MPC to defer to the perspective of a prudent layperson, who possesses an average knowledge of health and medicine. If the PLP Standard is met, MPC is required to pay for all health care items and services furnished or required to screen and stabilize that Emergency Medical Condition.

53.     UMMS has fulfilled its legal and contractual duties by providing emergency medical services to MPC Members consistent with its obligations under EMTALA and the PHP Agreement.

54.     MPC, on the other hand, has broken its legal and contractual obligations. MPC adjudicates—and denies—emergency claims using a flawed and unlawful coverage standard, including automatically denying claims not on its auto-approval list and relying on retrospective clinical assessments instead of the PLP Standard.

55.     MPC's denial rates consistently exceed those of other payors, including other Medicaid MCOs, and reach over 75% at certain UMMS facilities.

56.     That extraordinary denial rate is driven by several unlawful practices adopted by MPC.

57.     MPC maintains a list (referred to by MPC as the "Sudden and Serious" list) of diagnosis codes. If an ED claim is submitted with a primary diagnosis code from this list, MPC promises to automatically pay the claim. MPC's list is narrowly curated and contains thousands

15

fewer codes than some other Medicaid MCOs. Additionally, as MPC has admitted in writing, MPC does not only use the list to automatically pay for services, but also to automatically deny payment for all other emergency services. The automatic denial of payment for services that are not on its **"Sudden and Serious" list ignores the PLP Standard in its entirety and is a gross, egregious,** and per se violation of federal and state law, the Plan Contract, and the PHP Agreement.

58.     Emergency room payment data shows that MPC makes payment decisions based on cost, rather than the applicable coverage standards. This approach **is reflected in MPC's** payment practices for ED screening services. When a patient presents at an ED, a practitioner will conduct a screening. **That screening is identified and billed as a numerical "procedural" code referred to as a "CPT" code.** The specific CPT code selected depends on the level of effort and other factors involved in the screening. The higher the level, the higher the associated payment owed by the Medicaid MCO to the provider. The lowest level CPT code is 99281, and higher, more complex screening CPT codes consist of 99282 through 99285. One or more of these codes may be billed for the same ED encounter. While MPC almost always pays for the CPT code 99281, the code with the lowest level (and lowest cost), it almost always denies all higher-level screening codes.

59.     An analysis of thousands of claims seeking payment for ED screening revealed that MPC pays for the codes that reflect higher and more costly screening codes less than 1% of the time. In other words, MPC rejects payment for the screening reflected in the more complex and more costly CPT codes over **99% of the time**.

60.     Data also demonstrates that there are specific categories of ED claims that MPC improperly targets for denial. Maryland Medicaid participants receive specialty behavioral health services through a behavioral health administrative services organization and not their MCO.

However, as MDH has made clear, services from emergency medicine providers in an ED setting are the responsibility of the MCO, regardless of diagnosis. Behavioral health care provided in the ED is considered a primary behavioral health service and is the responsibility of the MCO.

61.     Notwithstanding that clear directive, MPC consistently refuses to pay for primary behavioral health care provided at an UMMS ED. A review of MPC's treatment of more than 10,000 claims for payment of behavioral health services provided to MPC Members in the ED shows that when a patient receives a behavioral health-specific diagnosis during the initial screening process at an UMMS ED, MPC denies payment for those behavioral health services approximately **79% of the time**. When the final discharge diagnosis includes at least one behavioral health diagnostic code, MPC denies payment for the services provided by UMMS to that patient in the ED approximately **69% of the time**.

62.     MPC also targets COVID-19-related ED claims for denial. In assessing over 3,000 claims for payment of an ED service where the diagnosis included COVID-19, UMMS denied payment approximately **70% of the time**.

63.     Perhaps cruelest of all, MPC routinely denies ED claims for services provided to unhoused persons, primarily on the ground that the condition did not warrant care in the ED.

64.     MPC's ED denial practices do not stem from a reasonable disagreement over medical judgment, but reflect a broad, bad-faith refusal to acknowledge the realities of patient care—driven by a pursuit of profit.

### IRO Reversals Underscore MPC's Abusive Denials

65.     MDH oversees the Maryland Medicaid Managed Care Program Independent Review Organization ("IRO") process. An IRO is an independent third party under contract with MDH to provide medical necessity case review of services delivered by a health care provider to

a Maryland Medicaid beneficiary enrolled with and paid by a Medicaid MCO. If a Medicaid MCO

refuses to reverse a claim denial, a provider can request an independent review by an IRO. The

IRO conducts an independent review of the claim and makes a coverage decision that is final and

binding.

66.     MPC's ED denials have been overturned by IROs on the ground that MPC has

failed to apply the PLP Standard. A review of just a few reversal decisions reveals that MPC denied

payment to UMMS for clearly covered services—even where patients presented at the ED with

life-threatening conditions and ongoing complications.

67.     **For example, MPC Member "Patient A"** sought care from an UMMS ED a few

days after being involved in a motor vehicle accident. Patient A reported chest pain and severe

abdominal pain and rated his pain a 10 out of 10. The treating physician ordered a CT scan of the

**patient's chest and another of the patient's thoracic spine.** MPC determined that those symptoms

**were not "acute" symptoms of sufficient severity to justify the CT scans.** MPC paid for the lowest

level of EMTALA screening and denied payment for the CT scans. MPC upheld this coverage

decision after an internal appeal brought by UMMS. UMMS was forced to appeal the denial to an

IRO, which reversed MPC's patently erroneous coverage position. In the words of the IRO:

> A prudent layperson with average knowledge of health and medicine would be
> expected to endorse the opinion that the absence of immediate medical attention for
> **motor vehicle accident and chest pain would result in placing the enrollee's health**
> in serious jeopardy, cause serious impairment of bodily function, or serious
> dysfunction of an organ or body part.

**The IRO overturned MPC's decision and concluded that Patient A "did have an emergency**

medical condition."

68.     **In another case, MPC Member "Patient B"** presented to an UMMS ED with

swelling, discomfort, and a history of recurrent infection requiring recent hospitalization. That

18

recent hospitalization had involved multiple open wounds and a MRSA infection. The UMMS physician documented hypertension, range of motion difficulties, and rashes and other skin conditions. For MPC, none of this indicated an emergency medical condition. In MPC's words, the "Prudent layperson standard was not met." MPC denied the claim not once, but twice following an internal appeal. The IRO overturned the denial, finding that Patient B's condition was consistent with potentially serious infectious or vascular conditions, and that, under the PLP Standard, a person would have sought emergency attention.

69.     In the aggregate, IRO reversals of MPC ED claim denials underscore not just that MPC applies the wrong standard and ignores the PLP Standard, but that it continues to do so, ignoring or belittling its members' presenting conditions and failing to correct its practices even after being routinely overturned by IROs and despite the concerns continually raised by UMMS over the years.

**MPC Refuses to Change its Systematic Denials**

70.     MPC denies payment for medical services, particularly ED services, provided to its members by UMMS at alarmingly high rates that exceed the denial rates of other payors, including other Medicaid MCOs. A review of ED claim denial behavior for 2023 and 2024 reveals that MPC Members account for only 5.5% of the total amount billed for ED services to all payors, but that MPC ED denials represent 25% of all payor ED service denials. With respect to Medicaid MCOs, MPC is even more of an outlier: MPC Members account for 16.3% of the total amount billed to Medicaid MCOs for ED services, and MPC ED denials represent 29.7% of Medicaid MCO ED service denials.

71.     As UMMS's efforts to address these alarmingly high rates of denials in the regular course of business proved unsuccessful, UMMS invoked the dispute resolution provision of the PHP Agreement by issuing a formal Dispute Notice to MPC on September 10, 2024.

72.     In its September 25, 2024, response to the Dispute Notice, MPC made the self-serving assertion that its claims adjudication practices comply with the legal and contractual obligations of the Maryland Medicaid program, but then proceeded to demonstrate that it does the exact opposite of what the law requires.

73.     For example, MPC acknowledged that it does not pay enhanced triage fees or fees for ancillary services, unless it deems them "clinically necessary" to rule out a serious condition. MPC admitted that in making this assessment, it applies a coverage standard that is retrospective in nature and is *narrower* than the PLP Standard.

74.     Per MPC's own words:

> Unfortunately, **the claims payment process shares limited data and, as a result, is not the ideal tool for determining if the ED visit met the PLP criteria**. To that end, MPC offers several solutions. Providers can submit medical records when they submit the initial ED claim, and those records will be reviewed. This can be done via paper or through the HIPAA 277 transaction. **Additionally, providers can appeal a denial**, supply medical records, and ask that either the entire claim be overturned or that individual ancillary charges needed to determine the seriousness of the incident be paid. (emphasis added)

75.     As MPC acknowledges, it has decided that its claim payment process is insufficient for assessing the PLP Standard and so MPC has designed a system that denies claims and forces providers into costly and time-consuming appeal procedures. Further, while MPC pays lip service to the notion that UMMS can provide medical records and documentation with the initial submission of ED claims, in reality, MPC's electronic systems are outdated and incapable of receiving from UMMS the fulsome records that MPC says must be submitted to ensure a fair and complete initial review. This forces UMMS to use time-consuming, manual processes that serve

as administrative barriers to claim submission. MPC is fully aware of the inadequacy of its claim submission capabilities, but has failed and refused to fix the flaws in this process, preferring to force UMMS to go through a grievance process.

76.     UMMS and MPC leadership met on November 5, 2024 to discuss MPC ED claim denials. MPC's own Chief Medical Officer, Dr. Bruce Vandiver, admitted that certain of UMMS's facilities were experiencing denial rates by MPC that exceeded 75%, which was significantly higher than the average denial rate for other providers in MPC's network. MPC also indicated that certain of UMMS's facilities' denial rates were five percent higher than the average in its network.

77.     Dr. Vandiver also conceded that, although MPC is prohibited by law from using a final diagnosis to deny a claim, MPC automatically denies all ED claims not coded with a diagnosis from its internal "Sudden and Serious" list and that such claims are routinely rejected "without exception or other consideration." MPC only actually reviews claims for services that are not on the "Sudden and Serious list" on appeal and, even then, MPC does not apply the PLP Standard. Rather, Dr. Vandiver advised that MPC applies its own internally developed clinical standard which, as described, uses a restrictive "Sudden and Serious" review standard that considers pain scores, symptom duration, and other criteria not found in applicable law or regulation.

78.     To evaluate and understand MPC's practices, UMMS requested copies of the internal guidelines and training materials that MPC reviewers use to adjudicate ED claims. UMMS also demanded that MPC change its claim adjudication practices for ED claims to conform to the PLP Standard.

79.     In a response letter dated December 6, 2024, MPC refused to provide the documentation requested. In that letter, MPC confirmed that it does not use the PLP Standard to determine whether to pay ED claims. Instead, MPC stated that "determinations are based on a

21

review of the totality of the medical record, with a focus on the presenting complaints." MPC, therefore, admitted that it does not prioritize the perspective of its own Members' reasonable decisions as required by the PLP Standard. Instead, MPC second-guesses these laypeople by making an independent medical determination based on the entire medical record, which includes the results of any screening and tests conducted by a medical professional after the fact. MPC's approach to evaluating ED claims intentionally ignores the PLP Standard.

80.     Worse still, MPC apparently entrusts these evaluations to unqualified, untrained staff. MPC utilizes non-clinician reviewers as the first level of review for ED appeals, even though they are not qualified to review medical records in the first instance. These untrained individuals only review the presenting symptoms and make subjective, retrospective assessments as to whether the MPC Member's decision to seek ED services was reasonable.

81.     In a presentation prepared by MPC dated January 28, 2025, MPC reaffirmed that it uses its "Sudden and Serious" diagnosis code list not only to "auto-pay" claims with certain diagnosis codes but also to "auto-deny" all other claims. In that document, MPC informed UMMS that it "had a new process in place to reduce the administrative burden for providers." MPC advised as of January 1, 2025, for any ED claims where the total charges billed for that encounter were $600 or less, "MPC will automatically pay the entire claims and not deny for Sudden and Serious."

82.     MPC's words—direct from its own presentation—admit that it uses its Sudden and Serious list to automatically deny claims for services that are not on that list. The automatic denial of claims based solely on the CPT code and without any review or consideration of the purpose or need for the service is a flat violation of federal and state law, the Plan Contract, and the PHP Agreement.

83.    **Not only is any "Sudden and Serious" standard inconsistent with the PLP Standard,** it also sets the PLP Standard aside in favor of a rigid and inflexible approach that applies to all ED admissions and is the antithesis of the personalized, patient-centric, subjective approach that the PLP Standard demands.

84.    MPC further admits to unlawful claims evaluation practices in a subsequent presentation that it prepared and dated January 31, 2025. MPC states: **"MPC uses a diagnosis (DX)-based 'Auto Pay' list to determine if the visit meets EMTALA."** MPC also admits that the list **"is regularly reviewed by MPC Physicians."** In other words, MPC completely disregards the PLP Standard and substitutes the clinical judgment of its employed physicians. More than 60% of **MPC's ED denials are** based on Denial Code 40, meaning that MPC has determined that emergency care was not medically necessary for the claim. MPC reaches this conclusion not by applying the PLP Standard as it must, but by reviewing the necessity of the services provided (particularly diagnostic and ancillary services) according to MPC's own rigid and generic payment criteria, applied by uncredentialed lay people on first level claim appeals determinations.

85.    That MPC prioritizes profits over care is further evidenced in its discussions with UMMS regarding care settings. MPC claim denials are frequently based on the insurance **company's conclusion** that a patient seeking care in an emergency room did not require the level of acute, emergency care that is unique to EDs. MPC routinely contends that **UMMS's** patients should **have sought a lower and less expensive level of care at an urgent care center or physician's** office, notwithstanding any factors that led that layperson to seek treatment at the ED.

86.    **MPC's standard for what necessitates ED care is self-**serving, medically dangerous, and legally wrong. Improperly denying ED claims is also an unacceptable approach to changing the behavior of MPC Members that MPC believes rely too heavily on the ED for care. Managing

23

appropriate ED utilization is the responsibility of MPC as a Medicaid MCO. The State has entrusted MPC with the responsibility not just to process claims; the State also pays MPC public funds to manage the health care of its members. Under this arrangement, MPC maintains direct access to its members and is responsible for educating them on how and when to seek care, navigate chronic conditions, and utilize appropriate alternatives to ED services. MPC must meet its obligation to ensure that sub-acute care settings and other means of obtaining medical assistance are available to its members.

87.    And yet, MPC has systematically failed to invest in the kinds of preventive care initiatives, member education programs, and arrangements with alternative care facilities and treatment options that could meaningfully reduce what it considers to be unnecessary ED visits. Instead, MPC reaps the financial benefits of those failures. When its members seek ED care, MPC leaves hospitals like UMMS to absorb the cost. Rather than using its resources to improve outcomes or reduce utilization through engagement, MPC profits by pushing costs downstream to safety-net providers.

88.    This is not an oversight; it is a business model—a deliberate and inequitable abdication of responsibility by MPC to the detriment of patients and the public, and benefiting only MPC, which retains the monies that it withholds from payment. UMMS is left to stabilize patients, regardless of payment, while MPC avoids accountability. The cost of this unreimbursed care is ultimately borne by Marylanders in the form of higher rates set by HSCRC, even though taxpayers already paid MPC to cover this medical care.

89.    Not surprisingly, **MPC rejected UMMS's repeated and reasonable attempts to** resolve this dispute through meaningful engagement. **Faced with MPC's continued refusal to bring**

its claims adjudication practices into compliance with applicable law and the Provider Agreement, UMMS is constrained to seek judicial relief.

*Other Care Settings*

90.    While the majority of the claim denials at issue in this case to date arise from the denial of ED services, MPC takes unjustified, legally unsupportable, and medically dangerous approaches to coverage decisions in other UMMS care settings. A large percentage of the claim denials in this action arise from the refusal of MPC to pay UMMS for medically necessary care.

91.    As an example, MPC denied the necessity of continued hospital care for an MPC Member who had just survived cardiac arrest and a gunshot wound on the grounds that the member was no longer in enough pain to justify hospitalization. Even though the patient was still recovering from traumatic injury, had undergone multiple procedures, and was being monitored for complications including unstable respiratory and cardiac status, MPC summarily concluded—based on checkbox criteria—that hospital-level care was no longer warranted.

92.    In another case, MPC denied coverage for a patient with multiple complex and active conditions—including a recent stroke, HIV, COVID-19, and sepsis—while that patient was still fighting to stabilize. That patient was hospitalized for more than three months and underwent several invasive procedures, including repairing a broken leg. Despite this background, MPC repeatedly denied coverage for portions of the stay, asserting—without any credible clinical basis—that the patient could have been safely discharged.

93.    In both cases, the care provided was neither optional nor discretionary; it was necessary, urgent, and, in any system governed by reason or decency, noncontroversial.

94.    **Other examples underscore that MPC's denials often have nothing to do with** the actual medical needs of their member. For example, in one instance, MPC denied payment for

weeks of recovery for a patient who had survived multiple gunshot wounds and undergone repeated surgeries, even while the patient was still using respiratory support and was being treated for open wounds.

95.     MPC has ignored the clinical judgment of front-line providers and denied claims for life-saving treatment even for the most fragile newborns. In one case, MPC consistently disputed and denied coverage for care for an infant born three months prematurely, weighing barely more than a pound who required continuous ventilatory support, nutrition support, and round-the-clock NICU monitoring for months. This neonate had been exposed to fentanyl and cocaine *in utero*. She was diagnosed with extreme respiratory distress, recurrent apnea, severe feeding intolerance, and numerous other comorbidities associated with extreme prematurity. Her condition remained fragile throughout, with complications arising at nearly every stage of her care.

96.     It is hard to conceive of a patient more in need of, and deserving of, intense clinical intervention. And yet, MPC denied significant portions of her treatment—questioning the need for care even during the height of her clinical instability.

97.     In another case, a newborn who had already endured a traumatic birth was admitted to the NICU in respiratory distress and remained hospitalized for months due to persistent instability. The child required ventilatory support, tube feeding, frequent apnea monitoring, and interdisciplinary care management throughout her admission. Multiple times, her discharge was delayed because her vital signs, respiratory function, and nutritional tolerance remained too fragile for her to be discharged. Yet, MPC denied broad segments of her hospitalization, disregarding and substituted its own cost-focused logic for the urgent clinical reality of the patient's condition.

98.     In yet another case, a premature infant born at just 28 weeks was transferred into UMMS from another hospital's NICU for evaluation and surgical placement of a gastrostomy tube,

due to ongoing feeding failure and persistent growth concerns. Here, the child had a history of congenital lung dysplasia, had required intubation and surfactant therapy, and remained on supplemental nutrition. Despite being clinically stable, he required continuous nutritional support, preoperative evaluation, and active monitoring until the feeding tube could be placed—a timeline that was determined in part by operating room and surgical team availability.

99.     Once again, MPC denied coverage for two days of hospitalization, asserting that the newborn should have been forced to undergo surgery much more quickly. MPC again retrospectively substituted its judgment for the treating neonatologists who—responsible for making life and death decisions—felt that additional preparatory care was required for safe surgery.

100.    These cases were not close calls—they are examples of a claims review process designed to prioritize corporate cost containment and profitability over patient care and, in some cases, survival. These cases highlight **not only MPC's** arbitrary review process but also the widespread harm it causes—burdening hospitals with care costs and leaving countless Marylanders without a safety net.

101.    Regardless of the care setting, an analysis of MPC's **denial patterns**—along with its own admissions regarding automatic ED claim denials and refusal to invest in managed care options for its Members—compels the conclusion that MPC operates a systemic, pretextual denial framework prioritizing cost avoidance over legal compliance, all to boost its bottom line.

102.    **In the face of MPC's business model and disregard of its legal and contractual** obligations, UMMS is compelled to bring this lawsuit to recover payment, with statutory interest, for the covered services provided to MPC Members that remain unpaid, as well as to put a stop to **MPC's ongoing unlawful practices.**

27

## COUNT I
### (Breach of Contract)

103.    UMMS re-alleges each of the preceding paragraphs as if fully set forth herein.

104.    The Agreement is a valid and enforceable agreement between UMMS and MPC.

105.    The Agreement constitutes a written contract under which MPC agreed to compensate UMMS for covered services rendered to patients who are MPC Members.

106.    UMMS has complied fully with all of the applicable and necessary terms and conditions of the Agreement, and has fulfilled each obligation on their part to be performed.

107.    **UMMS has suffered millions in losses, including for, without limitation, MPC's** improper denial of services and claims related to behavioral and emergency health care.

108.    MPC breached the Agreement by failing to properly compensate UMMS for covered claims.

109.    Every contract, including the Agreement, contains an implied covenant of good faith and fair dealing, which prohibits one party to a contract from acting in such a manner as to prevent the other party from performing its obligations under the contract. MPC has violated that implied covenant.

110.    As a direct and proximate result of the breaches of the Agreement, UMMS has been damaged in excess of $15 million in economic losses, including but not limited to, payment for unpaid claims, plus interest.

## COUNT II
### (Unjust Enrichment)

111.    UMMS re-alleges each of the preceding paragraphs as if fully set forth herein.

28

112.   In the alternative, UMMS has conferred a benefit upon MPC by providing services to MPC's members with the understanding and expectation that MPC would compensate UMMS for those services.

113.   MPC was aware that UMMS was both providing services to MPC's members and that UMMS understood and expected that MPC would compensate UMMS for those services.

114.   MPC has continued to accept this benefit under circumstances that make it inequitable for MPC to retain federal and state tax dollars entrusted to MPC by the State of Maryland to provide for the medical needs of its members.

115.   MPC has been unjustly enriched in excess of $15 million.

## COUNT III
### (Declaratory Relief)

116.   UMMS re-alleges each of the preceding paragraphs as if fully set forth herein.

117.   MPC's conduct has created an actual and justiciable controversy between UMMS and MPC concerning MPC's obligations under the Agreement to pay for services provided by UMMS to MPC's Members.

118.   Such actual and justiciable controversy will continue to exist between UMMS and MPC regarding MPC's failure to pay for services in accordance with the Agreement. Without judicial clarification, MPC will continue denying claims based on its own internal criteria that conflict with its contractual and legal duties, thereby causing UMMS financial harm and compromising its ability to provide the critical health care services to Maryland's Medicaid population. A declaration is therefore necessary to resolve the parties' ongoing dispute regarding MPC's obligations under the PHP Agreement and applicable Medicaid standards.

119.   UMMS therefore seeks a declaratory judgment on the parties' rights, status, and other legal relations under the Agreement, and applicable federal and state law. Specifically,

UMMS seeks a declaration that: (i) MPC has breached the Agreement by failing to pay UMMS for the services referenced herein that UMMS has provided to MPC's members; (ii) that MPC's use of internally developed code lists—such as the so-called "Sudden and Serious" list—to automatically deny or downcode claims without regard to the presenting symptoms or treating provider's judgment violates the Agreement and applicable law; (iii) that MPC's denial of claims for behavioral health-related emergency care, including cases involving substance use, psychiatric crises, and suicidality, is in violation of its obligations under the Agreement and governing Medicaid standards; and (iv) that MPC's systemic failure to apply the prudent layperson standard in evaluating emergency claims constitutes an ongoing breach of its contractual and legal obligations.

**COUNT IV**
**(Injunctive Relief)**

120.   UMMS re-alleges each of the preceding paragraphs as if fully set forth herein.

121.   UMMS and MPC are parties to the Agreement, which is a valid and enforceable contract under which MPC agreed to compensate UMMS for covered services rendered to patients who are MPC Members. UMMS has complied fully with all of the applicable and necessary terms and conditions of the Agreement, and has fulfilled each obligation on their part to be performed. MPC has breached and continues to breach the Agreement by failing to properly compensate UMMS for covered claims.

122.   UMMS has already suffered harm as a result of MPC's actions and will continue to suffer harm if MPC is not permanently enjoined.

123.   There is a strong likelihood that UMMS is entitled to a permanent injunction on the following MPC action: (i) using its internally developed code lists—such as the so-called "Sudden and Serious" list—to automatically deny or downcode claims; (ii) denying claims for behavioral

30

health-related emergency care, including cases involving substance use, psychiatric crises, and suicidality; and (iii) setting aside the prudent layperson standard when evaluating emergency claims. UMMS has substantial evidence supporting its claim, including documentation from MPC that demonstrates its own improper actions.

124.    The balance of convenience decisively favors UMMS. An injunction would deliver substantial and immediate relief to UMMS and the state health-system while imposing only minimal burdens on MPC. **Left unchecked, MPC's breach of its contractual duty** will perpetuate irreparable harm to UMMS, whereas granting injunctive relief merely obliges MPC to honor the Agreement it freely executed.

125.    Absent injunctive relief, UMMS will continue to suffer immediate and irreparable harm that monetary damages will not sufficiently address.

126.    The requested injunction squarely advances the public interest. MPC, a for-profit entity financed in part with State and federal tax dollars, has unjustifiably declined to pay certain claims, resulting in uncompensated health care costs that are ultimately borne by the Maryland health care system and Maryland taxpayers. Granting the requested injunction will help safeguard the integrity of public funds, curb the cascading cost of care, and protect State residents from further inflationary effects of these claim denials.

127.    For the aforementioned reasons, UMMS seeks injunctive relief. Specifically, UMMS seeks to enjoin MPC from: (i) using its internally developed code lists—such as the so-called **"Sudden and Serious" list**—to automatically deny or downcode claims; (ii) denying claims for behavioral health-related emergency care, including cases involving substance use, psychiatric crises, and suicidality; and (iii) setting aside the prudent layperson standard when evaluating emergency claims.

### PRAYER FOR RELIEF

WHEREFORE, UMMS respectfully requests that the Court enter a judgment in its favor as follows:

A.    As to Count I, compensatory damages in excess of $15 million, including, but not limited to, all amounts that MPC failed to pay UMMS for claims that were timely submitted to MPC for payment in accordance with the terms of the Agreement;

B.    **As to Count I, specific performance of MPC's obligations under the Agreement** with respect to all unpaid or partially paid claims in the preceding three years (as an alternative to damages) and for all forthcoming claims for the remainder of the **Agreement's term,** because a valid contract exists, MPC is able to perform its obligations, UMMS has performed and will continue to perform its obligations, and the balance of equities tips in favor of UMMS;

C.    As to Count II, compensatory damages in excess of $15 million, including, **representing the value of the services UMMS rendered to MPC's members for** which MPC failed to provide payment, and by which MPC was unjustly enriched;

D.    As to Count III, a declaration that:

    i.  MPC has breached the Agreement by failing to pay UMMS for the services **referenced herein that UMMS has provided to MPC's members;**

    ii.  **MPC's use of internally developed code lists—such as the so-called** "Sudden and Serious" list—to automatically deny or downcode claims **without regard to the presenting symptoms or treating provider's judgment** violates the Agreement and applicable law;

      iii.  **MPC's denial of claims for behavioral health**-related emergency care, including cases involving substance use, psychiatric crises, and suicidality, is in violation of its obligations under the Agreement and governing Medicaid standards; and

      iv.  **MPC's systemic failure to apply the prudent layperson standard in** evaluating emergency claims constitutes an ongoing breach of its contractual and legal obligations;

E.    As to Count IV, injunctive relief enjoining MPC from

      i.  using its internally developed code lists—such as the so-**called "Sudden and Serious" list**—to automatically deny or downcode claims;

      ii.  denying claims for behavioral health-related emergency care, including cases involving substance use, psychiatric crises, and suicidality; and

      iii.  setting aside the prudent layperson standard when evaluating emergency claims;

F.    All available interest; and

G.    Such other and further relief as the Court deems just and proper.

*-- Signatures on the following page --*

Dated this 16th day of June, 2025.

DLA PIPER LLP (US)

_s/  Brett Ingerman_
Brett Ingerman (CPF/AIS 9412140078)
Kathleen A. Birrane (CPF/AIS 8612010038)
Joseph Davison (*pro hac vice* forthcoming)
DLA PIPER LLP (US)
650 S. Exeter St., Suite 1100
Baltimore, Maryland 21202-4576
410-580-4000
brett.ingerman@us.dlapiper.com
kathleen.birrane@us.dlapiper.com
joseph.davison@us.dlapiper.com

_s/  Vinay Kohli_
Vinay Kohli (*pro hac vice* forthcoming)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
310-557-2900
vkohli@proskauer.com

D. Austin Rettew (*pro hac vice* forthcoming)
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
212-969-3000
arettew@proskauer.com

*Attorneys for Plaintiff*

## JURY DEMAND

Pursuant to Md. R. Civ. P. Cir. Ct. 2–325, Plaintiff demands a trial by jury on all issues raised in the Complaint.